FILED
U.S. Bankruptcy Court
Western District of NC

FEB - 1 2005

David E. Welch, Clerk
Asheville Division
SYM

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Asheville Division

In Re: )
)
**GEORGE M. MATTA** ) Case No.: 03-11017
**PAIGE E. MATTA,** ) Chapter 7
)
Debtors. )
_____ )
)
**LOEF FAMILY ENTERPRISES, L.P., a** ) Adv. Proc. 04-1011
**Georgia Limited Partnership and** )
**ROBERT L. BLUMBERG, as Trustee of** )
**the Robert L. Blumberg Revocable** )
**Trust Dated September 22, 1998,** )
)
Plaintiff, )     JUDGMENT ENTERED ON  FEB - 1 2005
)
v. )
)
**GEORGE E. MATTA and** )
**PAIGE E. MATTA,** )
)
Defendants. )
_____ )

## ORDER

This matter came before the court upon the Complaint of Loef Family Enterprises, L.P. and Robert L. Blumberg, as Trustee of the Robert L. Blumberg Revocable Trust dated September 22, 1998, ("plaintiffs") seeking a determination that pursuant to 11 U.S.C. § 727(a)(2)(A) the debtors' discharge should be denied and recovery of funds converted by the debtors. Based upon the facts presented, the court finds that the plaintiffs have met their burden of establishing by a preponderance of the evidence that the debtors sold stock owned by them with the intent to

hinder, delay, or defraud the plaintiffs within one year before the date of the filing of their petition. Therefore, the debtors' discharge shall be denied, and the plaintiffs are entitled to a judgment for the funds converted by the debtors.

**FINDINGS OF FACT**

1. Before filing bankruptcy, the debtors operated a restaurant in Athens, Georgia, known as Compadre's Mexican Restaurant.

2. The debtors ran Compadre's in leased space on the first floor of the Park Plaza Building, which was co-owned by the plaintiffs.

3. Pursuant to Paragraph 20.2 of their lease agreement with the plaintiffs, the debtors were entitled to a Right of First Refusal of Purchase in the event the plaintiffs chose to sell the Park Plaza Building.

4. George Matta (as co-owner with Paige Matta of F.G.G.S., Inc., d/b/a Compadre's) exercised the right of first refusal and entered into a Purchase and Sale Agreement with the plaintiffs for the purchase of the Park Plaza Building.

5. In accordance with the terms of the Purchase and Sale Agreement, George Matta, on behalf of F.G.G.S., Inc., entered into two Secured Promissory Notes with the plaintiffs dated February 5, 2001. One of the notes was in favor of Loef Family Enterprises in the amount of One Hundred Fifty Thousand Dollars

($150,000.00) (the "Loef Note"), and the other note was in favor of 1031 Qualified Intermediary, LLC, in the amount of One Hundred Fifty Thousand Dollars ($150,000.00) (the "Trust Note").

6. The Loef Note and the Trust Note were personally guaranteed by George Matta. In addition, the Loef Note and the Trust Note were secured by the pledge of certain stock belonging to the debtors, as set forth in Stock Pledge Agreements dated February 5, 2001, which were executed by both George and Paige Matta in favor of the plaintiffs. The stock was owned by the debtors as joint tenants and was being held in a Charles Schwab Account. Finally, the debtors executed UCC-1 Financing Statements to secure the stock as collateral for the Loef Note and the Trust Note.

7. The closing on the sale of the Park Plaza Building to the debtors took place on February 5, 2001, and the value of the stock pledged by the Mattas pursuant to the Stock Pledge Agreements on that day was $101,642.09.

8. The understanding between the parties after the February 5, 2001, closing, was that physical share certificates reflecting all of the stock held by the debtors in the Charles Schwab account would be delivered by Charles Schwab to the attorney who represented the plaintiffs at closing, Sheldon Friedman. This understanding was reflected in correspondence

between Mr. Friedman and the debtors' closing attorney, Eric Krasle.

9. For example, the day after the closing, Mr. Krasle sent a letter to Charles Schwab requesting the physical share certificates and instructing Schwab to send the certificates to Mr. Friedman.

10. Charles Schwab wrote the debtors directly in response to Mr. Krasle's letter and informed them that in order to complete their request regarding the share certificates, the debtors would need to verbally verify the request. Therefore, Schwab asked the debtors to resubmit their request regarding the certificates along with a telephone number where they could be reached during business hours. Upon receipt of this information, Schwab indicated they would process the debtors' request as soon as possible.

11. On March 7, 2001, Mr. Krasle wrote Mr. Friedman that he had been re-contacted by Charles Schwab so they could obtain Mr. Matta's phone number in order to verify the request regarding the share certificates. Mr. Krasle's letter indicated that the debtors had provided the information to Schwab such that Schwab should be processing their request.

12. Over the course of the next few months, several letters were exchanged between Mr. Krasle and Mr. Friedman regarding whether or not Schwab had recorded the Matta's pledge

4

of their stock as security for the Loef Note and the Trust Note. In a letter dated August 15, 2001, Mr. Krasle indicated that "Schwab had in fact recorded the pledge against value in the stock account." However, Mr. Friedman never received any documentation to confirm that Schwab had recorded the pledge and questioned how Mr. Krasle could know that Schwab had recorded the pledge in the absence of documentation to confirm the same.

13. At trial, Mr. Matta neither admitted nor denied that he had provided Schwab with verbal confirmation regarding the share certificates. He did testify that he believed that Mr. Friedman would handle the pledge of stock and that all the necessary steps had been taken to pledge the stock. However, he could not explain why, if he had called Charles Schwab, the stock was not successfully pledged.

14. Before closing on the purchase of the Park Plaza Building, the debtors and their family moved to Asheville, North Carolina, to open a steak house. George Matta started building the steak house in approximately February 2001, and based on his previous experience owning restaurants, Mr. Matta estimated that it would take approximately three months to complete construction and open the restaurant.

15. However, the construction took approximately ten months, and the restaurant did not open until November 2001 primarily due to construction delays and problems with

5

inspections. Moreover, the start-up costs for the restaurant exceeded Mr. Matta's anticipated costs by approximately $150,000. Finally, Mr. Matta testified that the restaurant never took off and was ultimately unsuccessful, largely, he felt, because it opened immediately after September 11, 2001, which was a difficult time for the restaurant industry as a whole.

16. The debtors closed on the purchase of the Park Plaza Building while attempting to open the restaurant in Asheville. Mr. Matta testified that he and Mrs. Matta believed that if they could get the restaurant up and running, it would produce the income necessary to pay the plaintiffs on their notes. However, due to the delays in construction and excessive start-up costs, the debtors had no income and began selling the Charles Schwab stock as they needed money to complete construction and open the restaurant, pay the plaintiffs, and otherwise make ends meet. Mr. Matta testified that he began selling the stock in November 2001. Ultimately, the debtors sold all of the Charles Schwab stock, leaving nothing as security for their indebtedness to the plaintiffs. Mr. Matta estimated that he received between $75,000 and $80,000 as proceeds from the sale of the stock.

17. It is uncontroverted that the debtors sold the stock without the plaintiffs' knowledge or consent and knowing that it was supposed to have been pledged to the plaintiffs. The

debtors did keep the plaintiffs abreast of the problems they were experiencing in trying to open the restaurant but never informed the plaintiffs about the sale of the stock. Mr. Matta testified at his deposition that he "was under the belief that [the plaintiffs] would prefer [him] to finish the project and try to repay them, than to stop two-thirds of the way and have them just get the stock as their only payment."

18. Despite their efforts to open a successful restaurant and to repay the notes, the debtors ultimately defaulted on the notes in approximately February 2002, and the parties stipulated that the value of the stock on February 5, 2002, was $63,189.

19. The plaintiffs did not learn that the Charles Schwab stock was unencumbered and had been sold by the debtors until the debtors defaulted on the notes.

20. The debtors filed a voluntary Chapter 13 case with this court on September 23, 2002, which was dismissed on November 27, 2002.

21. The debtors subsequently filed this voluntary Chapter 7 case with this court on August 28, 2003. Thereafter, on February 24, 2004, the plaintiffs commenced this adversary proceeding objecting to the debtors' discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

7

**CONCLUSIONS OF LAW**

1. Pursuant to Bankruptcy Rule 4005, the plaintiffs have the burden of proving the elements of 11 U.S.C. § 727(a)(2)(A).

2. 11 U.S.C. § 727(a)(2)(A) provides as follows:

> (a) The court shall grant the debtor a discharge, unless--
> * * *
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
> * * *
> (A) property of the debtor, within one year before the date of the filing of the petition.

3. Thus, in order to meet their burden, the plaintiffs must show:

> [1] that the act complained of was done within the one year before the date of the filing of the petition; [2] that the act was done with actual intent to hinder, delay or defraud a creditor . . . ; [3] that the act was that of the debtor or a duly authorized agent of the debtor; [and] [4] that the act consisted of transferring, removing, destroying or concealing any of the debtor's property . . . .

See 6 Collier on Bankruptcy ¶ 727.02 at 727-12 (15th ed. 2004).

4. There is no dispute that the debtors transferred the Charles Schwab stock within the one year before the date of the filing of the petition. The only real dispute, then, is whether the debtors transferred the stock with the actual intent to hinder, delay, or defraud the plaintiffs.

8

5.  With respect to the intent requirement, the debtors are unlikely to testify or otherwise offer direct evidence regarding their intent. Therefore, the court can draw inferences from the facts and circumstances of this case and may rely on certain "badges of fraud" as further evidence of the requisite intent. See Zanderman, Inc. v. Sandoval, 153 F.3d 722, 1998 WL 497475, *2 (4th Cir. 1998) (unpublished) (citing In re Woodfield, 978 F.2d 516, 519 (9th Cir. 1992)). The presence of only one of these factors can necessitate the court's finding that a transfer was fraudulently made, and "certainly, the presence of several factors 'can lead inescapably to the conclusion that the debtor possessed the requisite intent.'" See id. (citing In re Penner, 107 B.R. 171, 175 (Bankr.N.D.Ind. 1989)(citations omitted)).

6.  In their Complaint, the plaintiffs allege that the debtors' transfer of the stock contained all of the "badges of fraud" pursuant to N.C. Gen. Stat. § 39-23.4 of the North Carolina Uniform Fraudulent Transfer Act. However, at trial the plaintiffs argued that the debtors' transfer of the Charles Schwab stock contained certain of the "badges of fraud" found in the comparable Georgia statute, Ga. Code Ann. § 18-2-74. Upon comparing the "badges of fraud" from the North Carolina and the Georgia statutes, the court finds that they are identical with the exception of two additional factors found in the North

9

Carolina statute. Therefore, the court will analyze this transfer under N.C. Gen. Stat. § 39-23.4.

7. N.C. Gen. Stat. § 39-23.4 contains the following "badges of fraud":

   (1) The transfer or obligation was to an insider;
   (2) The debtor retained possession or control of the property transferred after the transfer;
   (3) The transfer or obligation was disclosed or concealed;
   (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
   (5) The transfer was of substantially all of the debtor's assets;
   (6) The debtor absconded;
   (7) The debtor removed or concealed assets;
   (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
   (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
   (10) The transfer occurred shortly before or shortly after a substantial debt was incurred;
   (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor;
   (12) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and
   (13) The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4.

8. Applying these principles to the facts of this case, the court finds that several of the "badges of fraud" are

present.  Specifically, the court finds the existence of the "badges of fraud" identified as 1, 3, 5, 9, and 10.

9.  First, the transfer was to an insider, as the debtors invested the majority of the proceeds of the stock in the construction of their Asheville restaurant.

10.  As evidenced by Mr. Matta's own testimony at trial and at his deposition, the transfer was concealed from the plaintiffs and done without their knowledge.  Mr. Matta insisted that he kept the plaintiffs abreast of the status of the restaurant project in Asheville, but when asked the following question by counsel for the plaintiffs at his deposition: "among the details which you did not provide was the fact that you were selling the stock that was supposed to be the collateral, correct?", Mr. Matta simply responded, "[c]orrect." See George Matta Dep. page 41, lines 16-19.

11.  With respect to the fifth and ninth "badges of fraud," the transfer of the stock involved the sale of substantially all of the debtors' assets, and the debtors were insolvent or became insolvent shortly after it was sold.  Mr. Matta testified that he had to complete construction of the restaurant in order to pay the plaintiffs on their notes, and he repeatedly explained that as a last resort he had to sell the stock as the only means available of funding construction of the restaurant.  He also testified that the debtors received no income for a substantial

11

amount of time while the restaurant was under construction. In essence, then, the debtors admitted that the stock was their last substantial asset and that they were insolvent or became insolvent as a result of its transfer.

12. Finally, the court finds the presence of the tenth badge of fraud in that the sale of the stock occurred between November 2001 and January 2002, shortly after the debtors became indebted to the plaintiffs in February 2001.

13. Although it does not specifically fall under one of the "badges of fraud," the court finds Mr. Matta's testimony at trial neither confirming nor denying whether he had called Charles Schwab to take the appropriate steps to complete the pledge of the stock evidence of his intent to defraud the plaintiffs. It is hard to believe that Mr. Matta would not specifically recall whether or not he had placed that phone call to Schwab. Moreover, Mr. Matta would clearly understand that had he called Schwab to complete the pledge of the stock, he would not have been able to subsequently sell the stock to use for the construction of the restaurant. The more likely explanation is that Mr. Matta failed to call Schwab to complete the pledge of the stock because he was experiencing great financial difficulty in opening the Asheville restaurant and knew that he may need the proceeds from the stock to complete construction of the restaurant.

14. For all of the reasons stated above, the court finds that the plaintiffs have met their burden of proving the elements of 11 U.S.C. § 727(a)(2)(A). Thus, the court finds that the debtors' discharge is denied. In addition, due to the debtors' conversion of the stock, the court awards the plaintiffs damages in the amount of Eighty Thousand Dollars ($80,000), which Mr. Matta testified were the proceeds the debtors received from the sale of the stock. Finally, the court denies the plaintiffs' claim for attorneys' fees and costs.

It is therefore **ORDERED** that:

1. The debtors' discharge is denied pursuant to 11 U.S.C. § 727(a)(2)(A);

2. The plaintiffs are awarded damages in the amount of Eighty Thousand Dollars ($80,000); and

3. The plaintiffs' claim for attorneys' fees and costs is denied.

*George R. Hodges*
Dated as of date entered

**George R. Hodges**
**United States Bankruptcy Judge**